[L. A. No. 3752. Department Two.—April 7, 1917.]

THE PEOPLE, Respondent, v. MAY K. RINDGE et al., Appellants.

PUBLIC HIGHWAY—ABATEMENT OF NUISANCES—EXISTENCE OF HIGHWAY — FINDINGS — INSUFFICIENCY OF EVIDENCE.—In this action brought to abate alleged nuisances maintained by defendants upon and across a public highway, it is held that the findings decreeing the existence of such a highway cannot be sustained under the evidence.

ID.—STRIP OF OCEAN BEACH—USER ACCORDING TO CUSTOM OF COUNTRY —LACK OF DEDICATION.—Dedication of a strip of ocean beach as

a public highway, which from the nature of the country is of slight use and of less value, is not to be inferred from the act of the owner in allowing settlers in the vicinity to travel over the strip according to a custom of the country.

APPEAL from an order of the Superior Court of Los Angeles County denying a new trial. Frank F. Oster, Judge presiding.

The facts are stated in the opinion of the court.

Anderson & Anderson, and Edward F. Wehrle, for Appellants.

J. D. Fredericks, District Attorney, Hartley Shaw, Thomas Lee Woolwine, District Attorney, George E. Cryer, Deputy District Attorney, and Hass & Dunnigan, for Respondent.

HENSHAW, J.—This action was brought to abate alleged nuisances maintained by defendants upon and across a public highway in the county of Los Angeles. The nuisances were gates and fences. The purpose of the litigation is to obtain a decree declaring that a public highway exists through the Malibu ranch along the shore of the Pacific Ocean. The Malibu ranch is about twenty-two miles long and contains about thirteen thousand acres. Thus it is quite narrow, varying in width from one mile and a half to two miles and a half. Its length is easterly and westerly. Its southern front is bounded and washed by the waters of the Pacific Ocean. The inland boundary line extends along the southerly slope of a rugged, inhospitable mountain chain, cut by deep ravines and canyons. At the foot of these mountains is a stretch of country narrow and comparatively level and known as mesa lands. The "shore of the Pacific" along which it is declared this highway extends is a shore characteristic of many hundreds of miles of California's littoral. Nearest to the ocean is a gradually sloping sandy beach between the lines of high and low tide. At low tide this beach is uncovered, and the sand wet and compacted affords a firm passageway for footmen and vehicles. Above this is a stretch of loose shifting sand, washed and blown above the line of ordinary high tide. This sand is dry and passage over it, though possible, is difficult. The footman sinks to his ankles, the horse to his fetlocks, the

vehicle which he is dragging half way or more to the hubs. Beyond this loose sand is a bluff varying in height from thirty to one hundred feet. Eroded from this bluff and lying at the foot of it is the talus. This bluff marks the seaward end of the comparatively level mesa lands of which we have spoken. These mesa lands in turn are channeled by ravines or arroyos, in winter carrying the mountain waters down the gulches to the ocean. In summer they are dry. Their banks usually are quite precipitous. The beach, of course, is likewise pierced in places by these short mountain streams, although in summer when these streams are not flowing the ocean frequently restores the sand washed away by the winter torrents. Still further the beach is broken by small promontories and rocky headlands jutting out into the ocean and by rocky outcrops here and there along its line. As is well known to anyone at all conversant with the primitive life of California, these beaches afforded the customary routes of travel up and down the coast. They were smooth and level, as compared with the mesa lands which were cut by numerous gullies, difficult of descent and equally difficult of ascent. Thus travel sought the beach and followed along the line of the hard sand uncovered by the ebbing tide. As a promontory was approached the traveler was compelled to leave the beach, climb to the mesa uplands, cross the promontory, descending to the beach on the farther side. Where the winter rains converted the arroyos into torrential streams progress was impossible. When the rising tide covered the hard beach the traveler was compelled to make his laborious way through the soft sands above, or, as was usually the practice, he interrupted his journey and remained where he was until the tide had again ebbed. Little or no construction work was ever done upon these roads, if roads they could be called. The traveler, usually on horseback, when it became necessary to leave the beach, sought the least precipitous place in the bluffs up which he rode or led his horse. Where this was impossible, the earth bank of the bluff was graded down.

Such are the general characteristics of many such ancient shoreways along the Pacific Ocean; such were the general characteristics of this ancient way. In those early days the principal towns or pueblos to the north and west of that of Los Angeles were San Buena Ventura in Ventura County, and Santa Barbara in the county bearing the same name.

Both of these counties, like the county of Los Angeles, are coast counties. There were several routes of travel between Los Angeles and these northerly pueblos through the mountain passes, in addition to the shore route just described. This shore route, beginning at a settlement on the ocean near the mouth of Santa Monica Canyon, ran about five miles through another grant, Boca de Santa Monica; then entered upon the Malibu grant, ran along its coast line and a mile or two beyond it to a gulch known as Yerba Buena or Little Sycamore Canyon, when it struck inland up this gulch and over the mountains and so to the towns in Ventura County. Travel over the whole of this route was possible only to the footman or to the horseman. Wheeled vehicles could not be dragged over it, and indeed there were in those early days but few wheeled vehicles—carretas—clumsy carts with solid wooden wheels, drawn by oxen.

The Malibu ranch was a Spanish grant, patent to which was issued to Matthew Keller in August, 1872. It was, as the foregoing description of its character at once makes plain, a stock range for the pasturing of sheep or cattle, and for this purpose it was used. Some of the surrounding lands were also Spanish or Mexican grants, but to the north of the Malibu was an unsurveyed strip of government land. In some of the upper reaches of the streams leading through the Malibu were small tracts of government land fitted for agriculture, and these were taken possession of by settlers. In the streams were trout; in the valleys quail, in the hills deer, and the country was therefore attractive to the fisherman and hunter. All of these people entering the ranch traveled, as it was necessary for them to travel, along the shoreway above described, until reaching the gulch or canyon which they desired to ascend they left the beach and struck inland. At the time when Matthew Keller received his patent, and for some time thereafter, the only persons actually living on the Malibu ranch were Matthew Keller and his family, with his overseer and vaqueros looking after his stock. Their home was in the Malibu Canyon, off from the line of the beach road, which they themselves used in reaching their home. The Malibu Canyon was about two miles westerly from the easterly boundary of the ranch. Farther to the westward, and about three miles from the western boundary of the ranch, is Lechuza Canyon. In this canyon lived the Tapias family in

their adobe home. The Tapias were Spanish. They claimed ownership to a part of the Malibu ranch, and were there living under their assertion of right. Neither they nor their visitors were apparently interfered with by Matthew Keller. From Lechuza Canyon eastward to Santa Monica it was possible to drag a carreta and it had been done from time to time by the Tapias. They left the ranch in 1876. Nor did Matthew Keller's successors interfere with the settlers who traveled the beach road until they came to their selected canyons, either in their use of the beach road or of the primitive private trails or rough roads which they constructed to reach their locations. Very few of them made a pretense of residing on their selected lands. Nor did he interfere with the travel along this beach road which sought to traverse the ranch en route to Ventura County. He did, however, interfere with and restrict the use of the ranch and, to a certain extent, of the road, to fishermen, hunters, and campers, and this because in many instances they killed his cattle, in others they made their camps near the springs which the cattle frequented for water and so drove them away, and, finally, because they occasioned not infrequent and destructive fires. The entry of the settlers came after Matthew Keller's death in 1881.

We have thus fairly epitomized the conditions existing when, in 1875, Matthew Keller filed a petition with the board of supervisors of Los Angeles County, offering to dedicate a public highway over his lands. This offer, upon which great reliance is placed by respondents, demands, therefore, somewhat detailed consideration. In November, 1875, a petition was filed by Matthew Keller, purporting to come from the owners of the lands along the route of the proposed highway, asking the supervisors "to lay out a public road along the beach fronting on said ranchos, being the only possible way said ranchos can be approached. Said projected road runs for the greater part along the beach of the Pacific Ocean, but at intervals is found impassable by reason of projecting points and rocks that make said highway impassable at high water. The necessity for such a road for the convenience of public travel will be quite obvious to any one authorized to view the same, as well as the nature of the improvements to be made." By way of description the petition set forth that "from the city of Santa Monica the road is a natural road along the beach for a distance of about six miles—the first obstruction

to travel commences at the point of an arched rock, within half a mile of the canyon, called Topanga, fronting on the Santa Monica ranch; the other obstructions to the public travel for wagons are found at intervals only between the aforesaid arched rock and the range line between 17 and 18 West Township," etc. [this range line runs a little to the west of Malibu Canyon where was Mr. Keller's home], a distance of about six miles in length—this road will connect the city of Santa Monica with an immense body of agricultural and horticultural lands, partly government land, for a distance of twenty miles along the beach, and to fishing grounds of great value to the community. The probable cost is about $300." This proposed road, as shown by its description, was merely the old beach road which we have described. Viewers were appointed and their report followed. It declared that the road from Santa Monica for a portion of the distance westerly was in good condition. It followed the beach. Certain obstructions were then noted, the necessity in one case of grading from the beach to the mesa lands, in another for blasting out obstructing rock in the line of the beach proper. Arriving at the Malibu ranch the viewers declare that there are two places along the beach between the easterly line of the ranch and Malibu Lake (at the mouth of Malibu Canyon) that need improvement "and then the passage along the beach from Santa Monica City will be open to travel for a distance of twenty-five miles, opening thereby a scope of country fit for settlement to the amount of over four thousand acres. We estimated the whole cost of improvement at $650 in all so as to make the road passable in all seasons of the year." The report then recommended the adoption of the petition and the immediate improvement of the road as suggested. The field-notes accompanying this report showed, as does the report itself, that the doing of no work was contemplated west of Malibu Lake. The field-notes were carried no farther than Malibu Lake and concluded, after fixing the easterly line of Malibu ranch, with "and following the beach to the Lake in said Rancho." The bond accompanying the Keller petition and executed by Keller was conditioned on "the opening of a road from Santa Monica to the Rancho Topanga Malibu."

There is one conspicuous infirmity in the Keller petition which impairs its legal effect as an offer of dedication, and

that is that his offer contemplates a road from Santa Monica westward to (or through) his ranch. But in fact he did not own the land between the easterly line of his ranch and the town of Santa Monica, and had no authority to offer a right of way as and for a public highway over those lands. Nor yet did the owners of those lands ever join in his petition. But let it be assumed that the offer at least was an expression of willingness and desire upon the part of Matthew Keller to dedicate a public road or highway across his whole ranch, the question remains, What resulted from this? It appears from the report of the viewers that they contemplated only the construction of a way from Santa Monica to Malibu Canyon; that this way was to follow the beach, saving in one place where it was necessary to leave it to cross a headland. The projecting rocks in the beach sands were to be blasted out. The talus in some places was to be graded. Something of this work was to be done within the boundaries of the Malibu ranch to the west of Malibu Canyon. The major portion of it was to be done to the westward of Malibu ranch. Keller was interested in securing a road on his ranch, at least up to Malibu Canyon where the ranch buildings were situated. But nevertheless it is fairly deducible, and the court originally found, that Keller's offer contemplated a beach highway through his ranch, his petition, it will be noted, setting forth the "obstructions to the public travel for wagons," and declared that such obstructions existed only between Santa Monica and Malibu Lake. At this time, however, there were no settlers whose rights call for consideration. The entries which they later made upon the public domain did not begin until 1882–85, after Keller's death. Nor does it appear that the viewers' report was ever adopted, nor that there was ever any formal acceptance of the Keller offer, and the situation thus presented is and can only be that which respondent adopts, namely, that the "offer of dedication contained in the Keller petition was of a road already in existence, used and traveled throughout the entire length of the ranch." Under this view respondent contends that the petition should be regarded rather as one for the improvement of an existing road than as an offer to dedicate a new road.

This elimination of the Keller offer from the consideration of the case leaves it for present purposes as though that offer had not been made; that is to say, we are brought back to a

contemplation of the question as to whether or not, within the meaning of our law, there was at the time of Keller's offer, or thereafter, a public highway across the Malibu ranch.

Under the findings which the court originally made and the judgment which it first gave, the existence of such a highway was declared and decreed, the court basing its conclusions, in part at least, upon the fact that this route was a recognized mode of access to the settlements in Ventura and the other northern counties. Upon motion for a new trial the court's views suffered a modification in that it granted the motion as to the existence or nonexistence of such a highway from the westerly line of Malibu to Lechuza Canyon, where the Tapias formerly resided. It denied the motion as to the remainder of the asserted highway, and from its order this appeal is taken.

Matthew Keller, as has been said, died in 1881. In 1874 Louis Sentous was on the ranch as foreman and overseer. In the following year he leased the ranch, and he and his brother remained as tenants for seventeen years. There were no settlers upon the government land to the north and west of the ranch until after Matthew Keller's death. This is conceded. The Tapias had departed, and aside from the occasional wayfarer who passed along the beach and through the rough trail over the Ventura Mountains, travel on the beach road there was none, saving that which pertained to the operations of the ranch and the activities of hunters and fishermen, who were of course either licensees or trespassers, with rare visits from peace officers in pursuit of offenders against the law. Moreover, no change was made in the road. No public improvements of any kind were constructed. Whatever may have been done to facilitate access to the ranch houses in Malibu Canyon was done by the owner and his tenants. Louis Sentous testifying as to road conditions west of Malibu Canyon as late as 1879, when he as tenant controlled the ranch, tells that he was assisting in establishing windmills which he had ordered at certain places on the ranch. He says, "from Malibu Canyon and Ramirez Canyon [some six or seven miles westward from Malibu Canyon] we traveled on the beach, and at Ramirez Canyon the vaqueros assisted with their lariats in pulling the wagon up the bluff. There was a trail on the mesa which we followed wherever we could but at places it was too steep to follow. A man went ahead on horseback and

picked the way for us. This is the first and last trip I ever made with a wagon beyond Malibu Canyon. Before that time I had never seen a wagon traveling beyond that canyon, but I have seen them since. During those early years I did not see any travelers on the ranch. We gave strict orders not to allow any one to go through there without permission either from Mr. Keller or ourselves. I know the order was carried out. Those orders were given a few years after I rented the ranch upon receiving information that some cattle had been shot by hunters.''

In 1882 Guthrie and Harris, coming over the Ventura Mountains, located on government land west of the Malibu. In 1884, three years after Matthew Keller's death, they drove a wagon across this beach road from Santa Monica, and thereafter went back and forth on several and perhaps numerous occasions. While Keller was alive his tenant Sentous asked him if he might prevent strangers from going on to the ranch, and was told that he could do so. He asked because he had heard something about a county road, but ''Keller told me that nothing had been done in the way of an agreement between himself and the county. I told him I was going to stop people passing through and he said that I might do so.''

Neither during the period of the Sentous tenancy nor thereafter, when the title to the ranch passed by purchase to Mr. Rindge, whose widow is the defendant in this action, was there any interference (saving as hereinafter noted) with the use made of the beach road by the settlers upon the government domain and those who had business with them. After 1884 a number of locations were made upon the government lands. It is within the facts to say that the public had absolutely no use for this beach road, since it led to an impasse in the Ventura Mountains, saving as that public was represented by these settlers. The conduct of the owners of the Malibu was certainly not unneighborly, since they freely allowed these settlers the use of this beach road, and more than that, permitted them to construct their roads and trails from the beach road over the lands of the Malibu to their locations on the government land to the north. The first of these settlers beginning at the westerly line end of the ranch were Harris and Guthrie. To make possible a means of communication between their lands to the west of the ranch and the town of

Santa Monica, and thus to avoid the necessity of crossing the almost impassable Ventura Mountains to the north, they did some work of grading in the arroyos, barrancas, and canyons on the western part of the ranch, and in 1884, for the first time in its history, they drove, as has been said, a two-horse wagon from Santa Monica to their locations. They lived upon their claims until the year 1900, when they sold to Mr. Rindge, the then owner of the Malibu. Thereafter there was no location and no settler on the lands immediately to the west and to the north of the westerly end of the Malibu. In 1886 one Sweeney made his location on government land in the upper reaches of Nicholas Canyon, some two or three miles east of the westerly line of the ranch. He sold to Nicholson, and in 1904 Nicholson's holdings passed by purchase to Mr. Rindge. There has since been no occupancy nor need of use for this beach road by any person west of Encinal Canyon. Between Encinal Canyon and Nicholas Canyon lies Lechuza Canyon, but, as has already been said, the Tapias, there located, moved away in 1876, and there has been no settlement in Lechuza Canyon, either on or off the ranch. In 1886, Marion Decker located upon a claim in Encinal Canyon immediately to the north of the line of the ranch. He came to his location over the Ventura Mountains. After establishing himself he built his private road down the canyon to the beach road. Decker retains his holdings, and is one of the principal witnesses for the plaintiff in its contention for a public highway. Decker testifies to the purchase by Mr. Rindge, beginning in 1895, of the settlers' claims until by 1901 "there were left only myself and Drake." Decker's road to the beach was unquestionably a private way, constructed with the acquiescence of the owners of the Malibu, and his use of the beach road to Santa Monica would no more establish its character as a public road than would the use of his road from his claim to the beach road fix the character of that as a public highway (*United States v. Rindge*, 208 Fed. 611). Las Trancas Canyon lies a little over three miles east of Lechuza Canyon, at which latter canyon, under the order granting a new trial, the public highway in the present state of the record now ends. Claims were taken up in this canyon by two men, who, in turn, sold to Mr. Rindge. The testimony of Mr. Decker is that there are claims on govern-

ment land in Escondido Canyon, which lies approximately half way between Lechuza Canyon and Malibu Canyon, owned by Schumacher, Mellus, Gillis, and Diss, and that they have done some work constructing a private road from their claims to the beach road. No one of these presented himself as a witness in the case. It appears, then, that even before the commencement of this action Decker and Drake were the only two persons who had any use for the beach road, and the contention of appellant is that the use which they have made and are making of it is precisely the use which they have made and are making of the private road from their claims to the beach road—a permissive use for a private way under the sanction of the owners of the ranch.

Appellants further rely upon the failure of the county of Los Angeles ever to declare this road a public highway, or ever to exercise any dominion or control over it, or ever to expend any money in its maintenance, care, or betterment. It was not declared a public highway by the court of sessions under the statutes of 1850 (Stats. 1849–50, p. 200). It did not become a public highway under the provisions of the act of 1855 (Stats. 1855, p. 192), which declares public highways to be those so designated by the court of sessions or board of supervisors, or which may be hereafter so declared by the board of supervisors. Nor yet did it become a public highway by virtue of the provisions of sections 2618 and 2619 of the Political Code as they read when that code took effect in January, 1873. Nor, finally, did it become a highway by virtue of the special road laws applicable to the county of Los Angeles, found in the statutes of 1877–78 (Stats. 1877–78, pp. 6 to 17), both of which acts contemplate that the supervisors, before any such road shall be or be decreed to be a public highway shall "cause said road to be properly located and declared as a public or county road," and in this connection reference also is made to section 2621 of the Political Code, which declares that "no route of travel used by one or more persons over another's land, shall hereafter become a public road or by-way by use, or until so declared by the board of supervisors or by dedication by the owner of the land affected."

The testimony of the settlers, whose occupancy of the government lands began about 1884, is to the general effect that

they were not disturbed by the owners of the Malibu ranch in their use of the beach road; that in many places it was, of course, no road at all. The settlers themselves, for their own convenience, made improvements in the natural conditions where it was necessary to leave the beach. The mesas were not cultivated and one could drive over them at pleasure. "In the early years there was nothing but a bridle trail. We drove where we pleased. There was no injury done. We first found a road or way marked by wagon tracks west of Encinal Canyon about 1888 or 1889. During the early years we traveled practically all the way from Malibu to Ramirez on the beach. Whatever patches of road there are which are not in hard sand have been built since that time. There were miles of the way along the Malibu ranch where, during the time we lived there, the only convenient way to travel was where the sand was made hard by the water." Such, and much more to like effect, is the concurrent evidence of plaintiff and defendants. It is to be noted that all such parts of the road as ran along the beach between high and low tide—and this was much the greater part of it—was not on the ranch at all. It was on tide-lands owned by the state. These natural conditions, with the slight improvement which the settlers made in them for their own convenience, continued until after Mr. Rindge acquired title to the ranch and in 1894 erected gates—one at the easterly entrance to the ranch, the other at Malibu Canyon. From the first Mr. Rindge insisted that there was no public way upon the ranch; that the road was only a private road, permission to use which had been accorded to the settlers. He gave to them keys to the locked gates. They, or some of them, insisted that the road was a public highway, and being advised by their attorneys that the acceptance and use of keys might militate against this position, they caused Mr. Rindge to be cited before the board of supervisors for obstructing a public highway, the citation being that Mr. Rindge show cause "why a certain gate described in said summons should not be removed from an alleged public highway." Mr. Rindge at this time had spent large sums of money in building a road from the eastern boundary of his ranch to Malibu Canyon. He made answer that the gate which he was maintaining was on this privately constructed and privately owned road. He conceded the existence of the

beach road as a public highway from the eastern boundary
of the ranch "to a point on the beach opposite the Malibu
Lagoon." He declared that none of the neighbors "had ever
been hindered or their friends from passing through, and
many privileges had been given them." The result of the
hearing under this citation was most inconclusive and unsat-
isfactory. No official action was taken by the supervisors
other than an indefinite continuance. It is asserted by plain-
tiff that this indefinite continuance was the result of a com-
promise agreement by which, in effect, Mr. Rindge admitted
the road through the ranch to be a public highway. On be-
half of the defendants it was stoutly insisted that his admis-
sion went only to the road from the easterly line to Malibu
Canyon, and that under this admission he ceased to lock the
gate at the entrance to the ranch, but maintained a locked
gate at Malibu Canyon. He persisted in this for some time,
and the settlers, upon the other hand, broke the lock and fre-
quently destroyed the gates. He posted signs and warnings
at and near the gates. He published similar warnings in the
newspapers. The form of such signs and notice was, "No
passing through the Malibu Ranch is allowed. No camping
thereon under penalty of the law. Shooting and hunting for-
bidden." Mr. Rindge, and Mrs. Rindge after him, continued
these interruptions and protests with pertinacity until finally
this action was brought.

It is manifest that if a public highway exists at all, it exists
by prescriptive user and not by official acceptance of an offer
of dedication, nor by any official recognition of the existence
of the highway. Indeed it is quite plain that any county
would be extremely slow to take into its charge and burden
itself with the care of such a strip of ocean beach, which from
the very nature of the country would have slight use and less
value. In opening the waterfront of their ranch to the travel
of foot and horse men the owners were but following the cus-
tom of the country. When that travel of necessity sought
the mesa uplands it would have been unneighborly to the last
degree to have checked it or turned it back, and the owner's
failure to do so no more established an intent to dedicate a
public highway than would his reception and entertainment
of such a traveler overnight have established his intent that
he should take up a permanent residence with him. Dedica-

tion under such conditions is not to be lightly inferred. (*Harding* v. *Jasper,* 14 Cal. 642; *Cerf* v. *Pfleging,* 94 Cal. 131, [29 Pac. 417]; *Niles* v. *City of Los Angeles,* 125 Cal. 572, [58 Pac. 190].) It is quite understandable that the settlers upon the one hand, because their passage was not interfered with, may have come to the conclusion that they were traveling as of absolute right over a public way, but their belief is not at all inconsistent with the position and proof of the defendants that throughout the history of this primitive trail it was but a private way, which developed into a more or less efficient road, in the construction of which the public took no part, and the burden of which construction was largely borne by the owners of the ranch—the settlers, for their own manifest advantage, contributing some of their labor.

It follows herefrom that the findings of the court decreeing the existence of a public highway across the Malibu ranch cannot be sustained, and that the order refusing to grant defendants' motion for a new trial must be reversed. In this connection it is to be noted that the Rindges had constructed upon the uplands and away from the tidal beach a new road to Malibu Canyon. Apparently it is conceded that the beach road as far as Malibu Canyon is or may be regarded as a public highway. But this admission or concession will not justify in and of itself a finding or declaration that the newly constructed private road is a public substitute for the original beach road.

The order denying a new trial is reversed.

Melvin, J., and Lorigan, J., concurred.